(June 14, 1912.)

## STATE, Respondent, v. JESSE MILES, Appellant.

[124 Pac. 786.]

FORGERY—UTTERING INSTRUMENT BEARING FORGED INDORSEMENT—PRESUMPTIONS ARISING FROM UTTERING INSTRUMENT.

(Syllabus by the court.)

1. Evidence examined in this case and *held* that it contains no substantial conflict, and that there is no direct or substantial evidence to support a judgment of conviction against the defendant.

2. Proof that a defendant charged with forgery had in his possession and passed a check bearing the forged indorsement of the name of the payee of the check does not constitute *prima facie* proof or a *prima facie* presumption that the defendant made the forged indorsement.

3. While the uttering of an instrument containing a forged indorsement does not raise a *prima facie* presumption that the person uttering the same forged the indorsement, that fact constitutes a circumstance against the defendant which the jury have a right to consider in connection with other facts and circumstances of the case in arriving at their verdict.

4. Evidence in this case examined and *held*, that it is in no way inconsistent with the innocence of the defendant, and that it all may be true and still it does not establish the guilt of the defendant.

APPEAL from the District Court of the Fourth Judicial District for Twin Falls County. Hon. C. O. Stockslager, Judge.

Prosecution for forgery. Verdict and judgment of conviction. Defendant appeals. *Reversed.*

F. A. Hutto, and H. C. Mills, for Appellant.

Where all the evidence in the case is consistent with defendant's innocence, and all the circumstances shown in the case are explained on that theory and appear reasonable, the defendant should be acquitted. (*State v. Seymour,* 10 Ida. 699, 79 Pac. 825; *State v. West,* 15 Ida. 73, 95 Pac. 949.)

D. C. McDougall, Attorney General, J. H. Peterson, and O. M. Van Duyn, Assistants to the Attorney General, and A. R. Hicks, Prosecuting Attorney for Twin Falls County, for the State, cite no authorities on points decided.

AILSHIE, J.—The appellant herein was prosecuted on the information of the prosecuting attorney, which charged him with making a false indorsement upon a check and uttering and passing the same to one Hartdegen. The defendant was in indigent circumstances, unable to employ counsel, and the court appointed H. C. Mills, Esq., to defend him. A verdict was returned in favor of the state, sentence and judgment were passed against the defendant, and this appeal was thereupon prosecuted.

The evidence in this case is very brief and there is very little, if any, conflict therein. It seems that on about the 8th day of July, 1911, the appellant and Thomas Moran met for the first time at Rogerson in Twin Falls county and went to Twin Falls together on the train, and that they spent the 9th and 10th of July in Twin Falls. Moran seems to have loaded a carload of sheep for his employer at Rogerson and received two checks for wages before departing for Twin Falls. When they arrived at Twin Falls, Moran and Miles went to the Pacific Hotel and the two engaged one room, which they occupied together for one or two nights. A man named Mackley, who was an old acquaintance and friend of Moran's, arrived in Twin Falls and put up at the same hotel on the evening of July 8th. Moran proceeded at once to get drunk, and it is agreed by him and all who saw him that he was thoroughly drunk the whole time he remained at Twin Falls, which was some three days. He testified on the witness-stand that he did not know much about what happened during the time he was there. He says that Mackley had a room adjoining his and that Miles, the defendant, roomed with him (Moran) the first night and possibly the second night, and he roomed with Mackley at least one night during the time they were in Twin Falls. On the 10th or 11th of July Miles went to a store, known as the Eldredge Clothing Co., and

cashed two checks, one for $45.50 and one for $50, and at the same time purchased a pair of shoes for the sum of $4. These checks had been made by Thomas Higgins on the Farmers & Merchants' Bank of Twin Falls and were payable to the order of Thos. Moran. At the time they were cashed by Hartdegen, the employee or clerk of the clothing company, they bore on the back the indorsement of Thos. Moran. Hartdegen subsequently had Miles arrested on the charge of forging the indorsement of Moran on one of these checks and thereby defrauding him, Hartdegen, of the sum of $50. Moran testified as to the circumstances under which he met Miles and to being in Twin Falls with him and being intoxicated during the time he was there. He testifies that he did not indorse these checks. On cross-examination he says:

"We stopped at the Pacific Hotel. Mr. Miles and I engaged the rooms together, and afterward Mr. Mackley engaged a room at the same place. I could not say whether it was the same evening of July 8th. I do not know what time we retired this Saturday evening, and do not know what happened on Sunday, the 9th; I do not know, not much. I do not know anything more that happened on Monday, the 10th. Mr. Mackley had a room adjoining mine at the Pacific Hotel. I could not say what rooms as I never slept with him. Q. Calling your attention to these checks, State's Exhibits 'A' and 'B.' You stated awhile ago that that signature resembled yours somewhat. Will you state in what particular? A. Well, the last part of it, sir, that is all. The word 'Moran,' the last part of it, also the last part of Exhibit 'B' resembles my signature. I have no recollection of indorsing those checks. Q. Could you have indorsed them yourself? A. No, sir. Q. You stated a moment ago that you have no recollection of what transpired? A. No, sir. Q. Would it not have been possible, Mr. Moran, for you to have signed those checks, not knowing anything about it, if you have no recollection of what happened? A. It might have been possible if I was doped. Q. Well, just state to the jury, please, what your condition was. A. Well, sir, I was inebriated pretty strong. I was in this condition

from the first time I got in town; I remained intoxicated about three days, I guess—Saturday, Sunday and Monday. Q. When did you leave Twin Falls for Rogerson again? A. Well, I couldn't tell exactly that day either. It must have been on Saturday—Saturday. Q. You left for Rogerson from Twin Falls? A. Yes, sir. I think I left those checks in the custody of Oakley & Haines about the 9th, I think. I did not take them out the following day. Q. Well, you stated you put them there the 9th; that would be Sunday, July 9th. And you cannot say when you took them out positively? A. Well, if I took them out, I took them out the next Tuesday. Q. The next Tuesday? A. Yes, sir. Q. Are you positive about that? A. No, sir, I am not. I am not positive whether I had them on Monday or Tuesday. I am positive that I took these checks and had them after I deposited them with Oakley & Haines; after this I did not deposit or turn these checks over to anyone. I went up to my room and went to bed, and the next morning I missed the checks. During this time I was in no condition to sign my name on a check.''

The foregoing covers practically all the evidence of Moran and substantially all the evidence on the part of the state.

Miles testified that he was with Moran and Mackley, whom they seem to have called "Red," more or less during the Saturday evening and Sunday that they were in Twin Falls, but that he did not know the name of either one. He knew Moran's friend, Mackley, by the name of "Red," and this evidence is corroborated by the other witnesses. He testifies that he has resided at Mackay, in this state, continuously for something like five years, and that he is a locomotive engineer. He testifies that on Monday afternoon he was in a poolroom in Twin Falls, and a man came up to the counter and asked one of the proprietors to cash some checks, and was told that he did not have that much money, and that the man thereupon asked him (Miles) to go with him to the bank and identify him, and Miles told him that he was not acquainted at the bank and therefore could be of no service to him, but finally told him that he was acquainted with a man named Hartdegen,

a clerk in one of the stores, and that he would take the checks down and cash them there for him, and that when this man gave him the checks they were indorsed, and that he supposed the man who had the checks was the owner of them and that the name indorsed on the back thereof was his name; that he accordingly took the checks to the store and cashed them and at the same time bought a pair of shoes and brought them back and left them in the poolroom. The proprietors of the poolroom corroborate this evidence in part. They say that Miles and another man were there with these checks and tried to get them cashed; that they told them it was too much money for them but to take them to the bank. They also testify to the fact that Miles went away and subsequently came back with the shoes and left them in the poolroom. Miles says he did not know who this man was, but supposed him to be the man whose name was indorsed on the checks, and that he has not been able to discover the man since he was arrested charged with the forgery of the indorsement. Neither this man nor Moran's friend, "Red" or Mackley, have been or were produced as witnesses in the case, and their whereabouts has not been accounted for.

While Moran claims that he did not indorse this check, he seems in fact to have but little memory of what transpired during the three days he was in Twin Falls, and his evidence is by no means positive or convincing that he did not indorse the check himself. He seems to have been around the hotel and the pool and billiard rooms drunk all the while, and the evidence shows that a great part of the time he was in a state of stupor and apparently did not know what was going on or what he was doing. He was with his friend and acquaintance, Mackley, as much as he was with the defendant. There is no pretense of evidence in the record to show that Miles actually forged Moran's name on this check. The state has sought to raise a legal presumption that he forged the indorsement by reason of the fact that he cashed the check and admits cashing the check to Hartdegen. This presumption is claimed on the theory that one who passes a forged instrument vouches for and certifies to its genuineness. This is undoubtedly true

as to the maker of the instrument, but that rule certainly cannot prevail to the extent here claimed with reference to an indorsement. This check was indorsed in blank, and after a check is once indorsed in blank by the payee, it can lawfully pass from hand to hand without further indorsement. (Sec. 3491, Rev. Codes.) It would be a dangerous rule of law to announce that anyone who cashes a check on which the name of the payee has been forged is himself *presumed to have forged the name of the payee* thereon. This is a very different proposition from that of passing an instrument forged in its inception and to which the maker's name has been forged.

The supreme court of Indiana in *Miller v. State,* 51 Ind. 405, held unqualifiedly that proof that a defendant had in his possession and uttered a commercial instrument with the forged indorsement of the name of the payee thereon did not raise the presumption that the defendant made the forged indorsement. In discussing this question the court said:

"Now, it might happen that a bill, thus apparently indorsed by the payee in blank, might pass through innocent hands, and it cannot be the law that each person through whose hands such a bill might pass, the indorsement turning out to be a forgery, is to be presumed, *prima facie,* to have made the forged instrument. . . . .

"We do not think it can be laid down as a rule of law that the uttering and publishing as true of a commercial instrument, with the name of the payee forged thereon, raises a presumption that the person uttering and publishing is guilty of forging the indorsement. On a charge of the forgery of the name, the uttering and publishing are circumstances to be considered by the jury, with any other evidence bearing on the question of the forgery, and what weight shall be given to the uttering and publishing is to be determined by the jury, in the same manner as they determine the weight of other evidence in criminal cases."

We have no doubt but that a jury would be authorized and justified in considering the fact that the defendant cashed the check which contained the forged indorsement thereon as

a circumstance against the defendant, but it would not be sufficient on which to rest a verdict of conviction. In this case that is the only fact on which to rest the charge that the appellant herein forged the indorsement of Moran on this check. The evidence in this case produced by the state is in no respect inconsistent with the innocence of the appellant. It may all be true and be admitted, and still the defendant be entirely innocent. As above stated, there is no real conflict in the evidence. If this man is in fact guilty, it ought not to be difficult for the state to gather sufficient facts and circumstances concerning a transaction like this which would definitely fix the guilt upon him. Unless he is proven guilty, he should not be confined in the state's prison. It is clear to us that he has not been proven guilty of the offense of forging the indorsement of Thomas Moran on this check, and unless satisfactory proof is produced that he has committed the crime, he should be acquitted.

The judgment in this case must be reversed, and it is so ordered, and a new trial is granted.

Stewart, C. J., and Sullivan, J., concur.