# Richmond.

## Denis v. Commonwealth.

January 14, 1926.

1.  Appeal and Error—*Assignment of Error—Petition for Writ of Error—
    Case at Bar.*—In the instant case, under the title of "Assignments
    of Error," it is said in the petition for the writ of error: "The
    record contains seventeen bills of exception. Without waiving error
    set out in the other bills of exception, we shall, in this petition,
    present for the consideration of the court those errors which are
    most apparent."

    *Held:* That those not so presented were not assignments of error and
    could not be considered.

2.  Forgery—*Defense that Accused was Under the Influence of Another—
    Exclusion of Answers to Questions as to Whether the Accused was Under
    the Influence of Another—Opinion Evidence—Case at Bar.*—In the
    instant case, a prosecution for forgery, the defense was that the
    accused was under the domination of another. A witness was asked
    whether he was not satisfied that accused was absolutely under the
    domination of this other and also asked, if accused was under the
    hypnotic influence of this other, "wouldn't that explain why you
    didn't understand" some of accused's statements. The answers
    to these questions were excluded and it was stated that the answers
    would have been yes.

    *Held:* That these answers were properly excluded as obnoxious to
    the opinion evidence rule, the jury after hearing all the evidence
    being in as good, if not better, position to draw conclusions than
    the witness.

3.  Expert and Opinion Evidence—*Test of Admissibility of Opinion Evi-
    dence.*—The test of admissibility of a conclusion of fact of a non-
    expert witness is this: Is it clear that the jurors would or could
    have been as fully and as exactly furnished with the data which
    formed the basis for the conclusion of the witness as the latter was?
    If so, the conclusion is inadmissible in evidence; if not, it is admis-
    sible.

4.  Witnesses—*Admissibility of Testimony on Cross-Examination—Discretion
    of Trial Court.*—The admissibility of testimony on cross-examina-
    tion, in which great latitude is allowed, rests largely in the discretion
    of the trial court.

5. Appeal and Error—*Exclusion of Evidence—Harmless Error—Case at Bar.*—In the instant case, a prosecution for forgery, where the defense was that accused was under the influence of another, the refusal to allow a witness to answer questions as to whether the accused was under the domination of this other, even if error would not be cause for reversal if it were the only error assigned, but would be treated as harmless where the jury had the data before them necessary to form conclusions as to the existence of such domination.

6. Criminal Law—*Effect of Hypnotism—Questions to Lay Witness.*—Where defense was that accused was under the influence of another, the question to a mere lay witness as to the effect of hypnotism was not improperly excluded as the jury could draw inferences and make deductions as well as the witness, probably with more impartiality.

7. Forgery—*Evidence—Printing Blanks with which Forgery was Committed Charged to Account of Accused—Case at Bar.*—In a prosecution for forgery of certificates of deposits, a witness testified that the blank forms afterwards filled out and converted into the certificates of deposits, mentioned in the indictment, were printed by his company on the order of a third person and charged to the accused by the direction of such third party. The admission of this testimony was objected to on the ground that the accused should be first connected with the printing. The intimacy of the third party with the accused was shown and that both accused and this third party had obtained a typewritten copy of a similar certificate and that the forged certificates were copied from such certificate.

   *Held:* That this testimony was admissible to show the guilty knowledge of the forgery or participation therein of accused as to the certificate which he had negotiated. It was entirely competent to show this by circumstantial evidence.

8. Appeal and Error—*Harmless Error—Exclusion of Evidence.*—Where it was plain that accused could not have been injured by the exclusion of a letter offered in evidence, the error, if any, was harmless.

9. Appeal and Error—*Harmless Error—Exclusion of Evidence—Expected Answer not Given.*—Where it was assigned as error that the answer of a witness to a question was excluded, and the anticipated answer of the witness was not given, the bill of exceptions failed to point out any error committed by the trial court.

10. Appeal and Error—*Harmless Error—Exclusion of Answer of Witness where there Could only have been one Answer.*—In the instant case exception was taken to the refusal to permit an answer to a question to a witness. In view of the witness's answer to the next preceding question there could have been but one answer and that was "yes" to this question.

    *Held:* That if there was any error in refusing to permit an answer to this question, it was harmless.

11. Appeal and Error—*Objection for the First Time on Appeal—Production*

*of Person in Court—Case at Bar.*—In the instant case, a prosecution for forgery, an associate or accomplice of accused was produced in court at the instance of the court. This person had been adjudged insane and committed to a hospital, but was out on parole. A juror had said that he wished to observe her personality, and after general examination the court said that it would not take the responsibility of putting the woman on the stand. The court's attention was called to the fact that the woman had not been sworn and that she had given the following answer to a question: "I don't think that I have done anything that would tend to incriminate me." The court instructed the jury to disregard that answer as testimony.

*Held:* That, as to the objection to the mere appearance of the woman before the jury, as no objection was made at the time it was too late to offer any on appeal.

12. Appeal and Error—*Harmless Error—Witnesses—Appearance and Questioning of a Person to Ascertain Whether She Should be put on the Stand as a Witness—Case at Bar.*—In the instant case a person was summoned and questioned by the court. It was clear that the object of the court in interrogating this person was to determine whether or not she should be put on the stand as a witness. As soon as the court ascertained that she was a lunatic on parole, it declined to put her on. A specific answer by the person to a question, objected to, was stricken out and the jury told to disregard it.

*Held:* That there was nothing in this procedure which could have been prejudicial to the accused.

13. Arguments of Counsel—*Remarks on the Appearance of a Person Under Whose Influence Accused was Alleged to be—Case at Bar.*—In the instant case, a prosecution for forgery, accused claimed that he was under the influence of a woman. This woman was summoned to court and examined by the judge to ascertain whether the court would call her as a witness. The court determined not to call her. In his closing argument prosecuting attorney said that the jury could look at her and see that she could not influence anybody, and the court declined to require him to withdraw his argument or modify it.

*Held:* That, the remark of prosecuting attorney was harmless.

14. Forgery—*Certificates of Deposits—Instructions.*—In a prosecution for forging certificates of deposits, the court instructed the jury that if the accused had the blank certificate of deposit printed, filled it up and signed the names thereto, or was present and aided or assisted in doing so, that he did utter or attempted to utter the certificate, with intent to defraud as charged in the indictment, then the accused was guilty; and, if accused had knowledge of the printing of the blank certificates, although he never gave the order personally to the printing company, and that he filled up the certificates or aided .and assisted in so doing and afterward uttered one, with intent to

defraud, the jury should find accused guilty. It was objected to the instructions that they were without evidence to support them. The certificate of deposit carried on its face such evidence of false-ness as would impress anyone of ordinary intelligence. A witness testified that the accused asked him to obtain for him a certificate of deposit which he did, and the certificates in controversy were identical with the copy furnished by him.

*Held:* That when these facts and others appearing in evidence were taken in consideration, they furnished ample support for the instructions complained of.

15. FORGERY—*Certificates of Deposits—Circumstantial Evidence.*—In a prosecution for forgery of certificates of deposits, the fact that much of the evidence was circumstantial was no objection to it.

16. FORGERY—*Reasonable Doubt—Circumstantial Evidence.*—In a prosecution for forgery it was for the jury to determine whether the evidence, circumstantial or otherwise, was sufficient to satisfy them beyond a reasonable doubt of the guilt of the accused; and in the instant case accused was amply protected by the instructions of the court on the subject of reasonable doubt. The doctrine of reasonable doubt was ridden to exhaustion.

17. FORGERY—*Uttering or Attempting to Utter—Making Alone a Crime.*—It is a crime to forge a paper with felonious intent even though it never gets out of the forger's possession. A person may be convicted of forgery by having possession of forged instruments with intent to defraud although never uttered by him.

18. FORGERY—*Instructions—Singling Out a Part Only of the Evidence—Case at Bar.*—In the instant case, a prosecution for forgery of certificates of deposits of a New York bank, accused asked the court to instruct the jury that the fact that defendant stated that he had seen the money in New York raised no presumption that he forged the certificates of deposits. This the court refused.

*Held:* No error, as the subject of presumptions was fully covered by other instructions granted; and, moreover, the instruction in question singled out and called attention to a part only of the evidence and the fact it tended to prove, and omitted all reference to a volume of evidence tending to raise a different presumption.

19. FORGERY—*Presumptions and Burden of Proof—Possession of Forged Instruments—Case at Bar.*—In the instant case, a prosecution for forgery of a certificate of deposit, the court refused to give, at the request of the defendant, an instruction "that the fact that a forged certificate of deposit was found in the defendant's possession, and that he uttered or used the same, raises no presumption of law in itself that he forged the same."

*Held:* No error.

20. APPEAL AND ERROR—*Assignment of Error—Sufficiency of Evidence to Support the Verdict—Case at Bar.*—In the instant case the petition

for the writ of error concluded by saying that it had been intended to discuss the question as to the sufficiency of the evidence to support the verdict, but owing to the length of the petition, and without waiving the question, petitioner was forced to forego presentation of this point. While this was not an assignment of error and could not be treated as such, yet as the Supreme Court of Appeals had been compelled to examine the whole record in order to pass upon questions properly raised, it was able to say that even if this matter had been properly assigned it could have afforded no relief as it was unable to say that the verdict was without evidence to support it, or that it was plainly contrary to the evidence.

Error to a judgment of the Hustings Court of the city of Richmond.

*Affirmed.*

Rev. Narcesse P. Denis, a priest of the Roman Catholic church, was convicted of forging and uttering as true a certificate of deposit, and was sentenced to serve a term of two years in the penitentiary. The case is here upon assignments of error to certain rulings of the trial court hereinafter set forth.

The accused was a man of education and intelligence. In July, 1920, he was placed in charge of the colored mission work of his church in the city of Richmond. In November, 1920, he came in contact with Minnie Edith Crump, who afterwards called herself Veronica Luximore Crump, whose life was so intimately associated with that of the accused for the next few years, and who so influenced him that it becomes necessary to give an account of it and the results of their association. She was a very delicate woman, about thirty years of age, five feet one inch tall, weighed from seventy to ninety pounds, and was anaemic, hysterical and cataleptic. She had been a member of the Presbyterian church, and her name remained on the books of that church at the time of the trial of the accused. Before her career as a Roman Catholic, she proposed to erect an expensive building for the Presbyterians, as a memorial to her sister who had died in France,

but the Presbyterians did not take kindly to her mythical project and it came to naught. It turned out afterwards that no sister of hers had died in France. She was apparently a very pious, exemplary Christian woman. In the summer of 1920 she applied to the accused to have masses said for her, and daily took the communion. In November, 1920, she offered her services free of charge, as clerk or secretary to the accused at the mission house. Her duty, amongst other things, was to get the mail, answer it and carry it to the postoffice. Shortly after taking up her duties she informed the accused that her uncle, a Mr. Purdie, of Glen Allen, Virginia, was very ill, and later Father Denis received a letter purporting to come from Purdie, requesting him to protect Miss Crump from the abuses of her family. She was then living with her mother, half-brother and sisters at No. 4 east Cary street, Richmond, Virginia. Later the accused received another letter from an attorney named Joseph A. Montague, purporting to be a practicing attorney in New York City, stating that Mr. Purdie had left all his wealth to Miss Crump, and that the accused had been appointed her legal guardian. It appeared after the arrest of the accused that both of these letters were forgeries, and that no such person as Joseph A. Montague existed. She also claimed to have had considerable estate left her by another uncle, and that she inherited large property from her father in England.

In February, 1921, Miss Crump apparently went into a trance, and appeared to carry on a conversation with invisible spirits which she claimed was "the Sacred Heart," in which she was exhorted to be good and told that she must suffer much. From time to time thereafter she continued to have visions and conversations with the spiritual world. On two occasions

a wafer, which after consecration is called the "Host,"·
miraculously appeared in a small tabernacle in a room
in the mission house.    She stated that the "Host"·
would again appear at the same place at a later time.
The accused had the door to the tabernacle and also
the room locked and gave the keys to another priest
who was going to Baltimore.    Shortly thereafter lights
appeared in the room, and the room was broken into
and it was found that the candles were lighted.    The
door of the tabernacle was taken off from the hinges
and in it was found the "Host" as formerly.    Whenever
this occurred the whole room and hall had the most
delightful odor of roses.    At one time a lamp suspended
from the ceiling of her room started swinging without
any apparent human interference.    She prophesied
that Bishop D. J. O'ponnell of Richmond would be
stricken in his pulpit at a certain time, and that these
attacks would be repeated, which was afterwards
fulfilled.    She stated at one time that she would become
blind about five o'clock on a given day, and would
remain blind for three days.    This also took place, and
her attending physician testified that he had applied
all the tests known to the profession, and as far as he
could discover she was absolutely blind.    Her sight was
restored at the time indicated by her.    Many happen-
ings were foretold in these trances or visitations, and
the accused was so impressed with them, and so con-
vinced that she had communication with the other
world, that he kept a diary or record of all of them in a
book which was found in his effects when he was
arrested.    The result of these manifestations was to
implant in the accused and to some extent in his
assistant, Rev. J. J. Callery, the belief that Miss Crump
was a person divinely inspired.    At one time, after a
day's absence from the rectory, she produced in her
own handwriting an account of another visitation
she had had during her absence, from which it appeared

that the spirit had directed her to form a religious society in Canada devoted to the Holy Eucharist, with the accused and his assistant as chaplains.

In obedience to what the accused and his assistant deemed to be spiritual directions, they resigned their duties in the mission in September, 1922, and prepared to go to Canada and carry out their new duties. About that time Miss Crump became very ill, and she and the two priests went to live at her mother's house, No. 4 east Cary street, Richmond, until she was strong enough to take the trip to Canada. This illness required the services of a trained nurse and the constant attention of her physician, Dr. E. J. Moseley, Jr., who was a member of the Baptist church.

Soon after going to reside at her mother's house Miss Crump began to execute deeds of trust for various individuals and institutions. Among the individuals upon whom settlements were made were the accused and Dr. E. J. Moseley, Jr., and members of the latter's family, and her attorney, J. Leicester Watts. These deeds settled large sums of money upon the different beneficiaries. All of the deeds were prepared by J. Leicester Watts, an attorney of the city of Richmond, and they covered a period from early in December, 1922, to the end of April, 1923, being forty-three in number and conveying upwards of $3,700,000. This wealth Miss Crump represented was bequeathed to her by her uncle, Purdie, of Glen Allen, Virginia, another uncle who left her his one-half interest in the London General Hospital, and by her father who devised to her his large estate in Farmboro Hants, England. These various estates were represented by her to be under the management of Joseph A. Montague, an attorney in New York City. In nearly all of them the accused and James Leicester Watts,

her Richmond attorney, were named as trustees. Among these deeds was one for a million dollars to found a home for wayward girls of all denominations in the State of Virginia, another for one million dollars for a charitable institution in Canada, of which the accused and his assistant were to be chaplains. She also executed a will on the _____ day of January, 1923. She had prefixed to this will, as a part thereof, a sort of autobiography of her imaginary life and troubles. Following this is a will prepared by her attorney, in which she disposed of practically no property, but containing provisions so ridiculous and full of nonsense that it is inconceivable that any sane person would have executed it. For instance, she devises to her half-brother and sisters "all the sweetest songs the birds can sing as well as a cup full of sunshine filled to overflowing to brighten their lives;" and to the children of another sister she bequeathes "all the flowers of the fields, the blossoms of the fruits, the white clouds, the odors of the willows which dip therein and the white clouds that float through the giant trees." She was not on friendly terms with her half-brother and sisters, and accused one of her sisters of having forged her name and collected money to the amount of some $40,000. It turned out on investigation that Miss Crump never at any time had any estate.

From time to time, during the year prior to the arrest of the accused, he received by due course of mail letters from the attorney, J. A. Montague, of New York, and Mr. Purdie, and from the Rev. Father Kennedy, a priest of the Paulist Order in New York. These letters, which were found among the papers of the accused upon his arrest, were all found to be forgeries. Father Kennedy, in these letters, represented

to the accused that he was in close touch with Mr. Montague and was acting in an advisory capacity with him in regard to the care of Miss Crump and the management of her estate and charitable enterprises. At the trial Father Kennedy, a highly cultivated gentleman, testified that his acquaintance with Miss Crump was very slight. He had met her once about ten years ago in Richmond, and once about a year ago in New York. He declared that all the letters purporting to have come from him to the accused were forgeries, and that he had never known any such person as Joseph A. Montague. When Father Kennedy was asked if he wrote the letter purporting to be dated March 15, 1922, he replied: "No, no: this is gush; I could not write gush like that. I never wrote a letter like that."

A comparison of the style of various letters written to the accused purporting to come from Attorney Montague, in New York, and from Father Kennedy would seem to satisfy almost any person of ordinary intelligence that they emanated from the same source.

Miss Crump enjoined on the accused and her attorney that great secrecy should be kept about her wealth and her disposition of it, as she did not wish her family to know anything of her wealth, especially in view of the fact that one of her half-sisters had checked out the money which she had brought to Richmond, and on account of that fact her New York attorney said that no more money should come to Virginia.

In April, 1923, the accused endeavored to borrow $16,000 for his personal use on one of the deeds of settlement made to him and Watts, the attorney, without the knowledge of Miss Crump. This effort was unsuccessful and the next day Miss Crump told Watts that she had pumped out of Father Denis the

fact that he had tried to borrow this money.    She then, with the accused, attempted to borrow $32,000 on the same security, but also failed.    Other unsuccessful attempts were made by Watts and the accused, as trustee, to borrow money on some of the deeds of trust.    While attempting to borrow money from Dr. Cosby, he said to him, and also to Attorney Watts at another time, that he knew the money was in New York and would swear to it, as he had seen it with his own eyes.    When asked why he made such a statement, he said that Miss Crump had a trance in which the spirit had said to her: "I, your God, have seen it with my own eyes, and you can testify you have seen it.    You can swear you have seen it."

The Federal Trust Company, of Richmond, to which application was made for a loan by Watts and the accused, informed them that the bank would only lend money on a negotiable certificate of deposit. Watts was then requested to obtain a certificate of deposit, and a day or two afterwards, to-wit, on Saturday, April 21, Watts obtained a typewritten copy of a certificate of deposit which he delivered to the accused, who handed it to Miss Crump, then present.    On April 25, Miss Crump produced two certificates of deposits on the First National Bank of New York, one for $50,000 to the credit of Watts and the accused as trustees for Miss Crump, and one to the accused personally for $2,770.    Both were dated April 23, and the $50,000 certificate bore interest at six per cent. Both were printed on very crude, sleazy paper and filled up with a very poor character of writing.    These certificates of deposits were given to the accused by Miss Crump.    It developed that they had been printed by the Colonial Stationery Company, of the city of Richmond, on the personal order of Miss

Crump, and had been delivered to her in person. An unsuccessful attempt had been made to borrow $1,000 on the certificate for $2,770 at the Planters National Bank and at the Federal Trust Company. The president of the Federal Trust Company called the attention of the accused to the crude appearance of the certificates and to the fact that the certificate for $50,000 carried interest at the rate of six per cent, which could not be expected of a first class bank in the city of New York. Mr. Hotchkiss, vice-president of the Planters National Bank, also pointed out indications that the certificates were not genuine.

Donald Register had sold to Miss Crump an automobile shortly before the last mentioned transaction. The accused was her agent in negotiating this purchase. When the car arrived, they were unable to pay for it, but the accused spoke to Register of the great wealth of Miss Crump, and as evidence of their good faith showed him the two certificates of deposits above mentioned. He became suspicious of them from their appearance, and took a complete memorandum of them. This occurred after banking hours on Saturday afternoon. On Monday morning the accused borrowed $1,000 from the First National Bank of the city of Richmond with his certificate of $2,770 as collateral. About the same time, Register, who said he thought it was the part of a good citizen not to allow a paper of this kind to be floating around, went to his banker and gave him an account of what he had seen and asked him to get in long distance telephone communication with the First National Bank of New York, and inquire about the certificates. He did so and in a few minutes was informed that the bank had never issued any such certificates, and had never had any dealings with the parties mentioned in

the certificates. He reported these facts to the chief of police and the latter immediately dispatched two officers to the Jefferson Hotel and arrested the accused, who had the money on his person and also the certificate of deposit for $50,000.

It should be stated that Watts, the attorney, and Dr. Moseley, the physician, both testified that they believed that Miss Crump was a person of great wealth; that she was in all respects entirely sincere in what she said and did, and that they were themselves deceived.

Miss Crump was shortly thereafter adjudged a lunatic, and was sent to the State Hospital at Staunton, but at the time of the trial was at home on parole.

The accused was indicted, tried and convicted, as hereinbefore stated.

The residue of the evidence, so far as necessary, is stated in connection with the various assignments of error.

*H. M. Smith, Jr., James R. Lenahan,* and *Alfred J. Kirsch,* for the plaintiff in error.

*John R. Saunders, Attorney General, Leon M. Bazile,* and *Lewis H. Machen, Assistant Attorneys General,* for the Commonwealth.

BURKS, J. (after making the foregoing statement of facts), delivered the opinion of the court.

[1] Under the title of "Assignments of Error," it is said in the petition for the writ of error: "The record contains seventeen bills of exceptions. Without waiving error set out in the other bills of exceptions we shall, in this petition, present for the consideration

·of the court those errors which are most apparent." Those not so presented are not assignments of error, .and cannot be considered. The rule on this subject is so well settled and has been so often stated as not to need repetition. *Lorillard & Co.* v. *Clay,* 127 Va. 734, 104 S. E. 384; *Mechanics Bank* v. *Schmelz Natl. Bank,* 136 Va. 33, 116 S. E. 380; *Thurston* v. *Woodward,* 139 Va. 315, 123 S. E. 366, and cases cited; Notes to Michie's Code, sec. 8346; Burks Pl. & Pr. (2d ed.), sec. 396, p. 771 and notes.

J. Leicester Watts, attorney for Miss Crump, was ·examined as a witness for the Commonwealth. On cross-examination by counsel for the accused in reference to the influence of Miss Crump over the accused, .and after he had testified at great length as to his :relations to these parties, and their conduct and relation to each other, testified as follows:

"Q. Don't you believe he was thoroughly under the ·domination and influence of Miss Crump?

"A. That is a point I don't know."

He was then asked: "Isn't it a fact, Mr. Watts, that from what you saw then, and what you have seen since, that you are perfectly satisfied that Father Denis is absolutely under the domination of Miss Crump?" Upon objection the answer was excluded, and it is .stated that the answer would have been: "Yes." .Exception was taken to the ruling and is embraced in bill of exception No. 3. The cross-examination was then continued as follows:

"Q. During your whole intercourse with Father Denis, did you ever see him do anything which made .you question his honesty or truthfulness in these matters?

"A. His conduct was always that of a gentleman.

"Q. I will go further than that. Wasn't his conduct that of a Christian, too?

"A. Yes, sir: although I never did understand some statements that were made which have already been recorded. I never have understood them to this day.

"Q. If he was under hypnotic influence of Miss Crump, wouldn't that explain why you didn't understand it?"

Upon objection to the answer to the last question, it was excluded and exception taken by the accused. It is stated that the answer would have been: "Yes." This exception is embraced in bill of exception No. 4.

[2–5] The refusal of the trial court to permit answers to the last question set forth in each of bills of exception Nos. 3 and 4 is assigned as error.

It is difficult to understand how the witness could have answered "yes" to the second question asked in exception No. 3 after having answered: "I don't know," to the first question, without plainly contradicting himself. Furthermore, the second question in exception No. 3 asks for the present domination of Miss Crump over the accused, rather than for her influence over him at the time of the commission of the offense charged. Later on the accused, testifying in his own behalf, said his eyes had been opened and she no longer had influence over him. For these reasons alone, the answer might have been properly excluded. But we do not wish to base our conclusions on so narrow a ground.

The real ground of the exclusion of the answer was that it was obnoxious to the opinion evidence rule. The books are filled with cases on the subject, and a number of them are cited in the petition for the writ of error. The rule has often come under discussion in this court, and there is not much further light to be thrown on it. In cases to which the instant case belongs, we adhere to the rule stated in *Shenandoah Valley R. Co.* v. *Murray*, 120 Va. 563, 578-9, 91 S. E.

740, 745, and upon the authorities therein cited. It is there said: "The test of admissibility of a conclusion of fact of a nonexpert witness is this: Is it clear that the jurors would or could have been as fully and as exactly furnished with the data which formed the basis for the conclusion of the witness as the latter was? If so, the conclusion is inadmissible in evidence; if not, it is admissible." The record in the instant case teems with the fullest details of everything that came under the observation of the witness as to the confidential relations of these parties. Not only so, but numerous other witnesses testify on the same subject, including the accused, who kept a diary of events relating to Miss Crump and her visitations or trances. The opinion of the witness would not have been helpful to the jury in making deductions from the data furnished. Indeed, after hearing all the evidence in the case, they were in as good, if not better, position to draw conclusions than the witness merely from his own observations. Even without seeing the witnesses or hearing them testify, we are satisfied that we have before us all the data necessary to draw a correct conclusion, and that the opinion of the witness would have added nothing of value. The jury were in a very much better position than the members of this court. The admissibility of the testimony on cross-examination, in which great latitude is allowed, rested largely in the discretion of the trial court, and we do not think its discretion has been abused. If, however, we had been of a different opinion, and this were the only error assigned, we would not, for this cause only, reverse the case, but treat it as harmless.

In speaking of the opinion evidence rule, it is well said in 3 Wigmore on Evidence (1st ed.), sec. 1929: "Under this rule we accomplish little by enforcing it.

and we should do no harm if we dispensed with it. We accomplish little, because, from the side on which the witness appears and from the form of the question his answer—that is, his opinion—may often be inferred. We should do no harm because, even when the final opinion or inference is admitted, the inference amounts in force usually to nothing unless it appears to be solidly based on satisfactory data, the existence and quality of which we can always bring out, if desirable, on cross-examination. Add to this that, under the present liberal application of the rule, and the practice as to new trials, a single erroneous ruling upon the single trifling answer of one witness out of a dozen or more in a trial occupying a day may overturn the whole result and cause a double expense of time, money and effort; and we perceive the absurdly unjust effects of the rule. And, finally, the utter impossibility of a consistent application of the rule, and consequent uncertainty of the law, and we understand how much more it makes for injustice rather than justice. It has done more than any other rule of procedure to reduce our litigation to a state of legalized gambling."

[6] The question mentioned in bill of exception No. 4, concerning the effect of hypnotism, related to a technical matter about which it was not shown that the witness had any technical knowledge or information. He was a mere lay witness, with no greater knowledge on the subject of hypnotism than members of the jury. They could draw inferences and make deductions as well as he, and probably more impartially. 22 Corpus Juris, 604; *Paine* v. *Aldrich*, 133 N. Y. 544, 30 N. Y. 725.

Moreover, the accused himself was unwilling to say that he had been hypnotized, though in the light of

events he admitted that he had done "a lot of foolish things." On this subject he testified as follows:

"By a juror:

"Q. Father Denis, do you believe in hypnotism?

"A. I do.

"Q. Do you believe that Miss Crump had the power to hypnotize people?

"A. I do not know.

"Q. Did you ever feel you were under her influence to such extent you were hynotized?

"A. I was under her influence to the extent that I did a lot of foolish things. Whether that is hypnotism, I cannot tell.

"Q. You will not say you were hypnotized?

"A. I cannot prove it; neither can I prove the contrary.

"By Mr. Satterfield:

"Q. Have you been a student of hypnotism?

"A. No, sir.

"Q. Do you know anything about it yourself?

"A. No, sir."

Much of what is said in discussing bill of exception No. 3 applies also to bill of exception No. 4.

[7] Exceptions 6 and 7 relate to the testimony of Mr. Underwood, of the Colonial Stationery Company to the effect that the blank forms afterwards filled out and converted into the certificates of deposits mentioned in the indictment were printed by his company on the personal order of Miss Crump, and charged to the accused by her direction. The specific objection was that it was not "admissible at this time to show in what name it stands on his books. That is not binding on us." That the accused should be first connected with the printing before the evidence offered could be introduced.

The accused was charged with forging and uttering as true two certificates of deposits purporting to have been issued by the First National Bank of New York, and the manifest object of this testimony was to show the guilty knowledge of the accused as to the certificate which he had negotiated. It was entirely competent to show this by circumstantial evidence.

Watts, the attorney for Miss Crump, saw her almost daily for several months, and nearly or quite always in the presence of the accused. The accused and Miss Crump had adjoining rooms in the same house, and she conferred with him on practically everything relating to her alleged large estate. Watts had already testified to these intimate business relations, and to the effect that the accused was, for the most part, a mouthpiece of Miss Crump. He further testified that when efforts to raise money on one of her numerous trust settlements failed, it was suggested by one of the bankers that Miss Crump get a certificate of deposit on New York and use it as collateral for any loan she might desire to make; that when the suggestion was made the accused asked him, in the presence of Miss Crump, to get him a certificate of deposit from one of the local banks; that he otbained a typewritten copy of such certificate and "handed it to either one or the other, they both present and both read the copy   *   *   *   I believe though I gave it to Father Denis and then he handed it to Miss Crump, and there was a little talk about it, but both were certainly there when I returned with it." This took place on April 21. Watts further testified on the subject as follows:

"A. The copy was furnished by me to them on Saturday, the 21st of April. The printed certificates were exhibited to me for the first time on Wednesday, April 25th.

"Q. Do you mean blank or filled in?

"A. Just like they are now.

"By Mr. Satterfield:

"Q. Like they are now?

"A. With the exception of the endorsements.

"Q. I mean those printed certificates?

"A. Fully filled out.

"Q. In whose possession were they?

"A. I would like to lead up to that a little bit.

"Q. All right; any explanation that is pertinent and proper.

"A. After this copy was furnished to them we were having a watchful waiting policy until these came.

"Q. Did you know they were coming?

"A. I was told that the certificates would come from New York.

"Q. By whom?

"A. By either one or both.

"Q. In the presence of each other?

"A. Oh, surely.

"Q. Don't you recall who said they were going to come from New York?

"A. Well, I couldn't recall every little detail connected with it, but the statement was made in my presence by either one of them. Both of them heard the statement and both, as well as I remember, commented upon the certificates coming from New York and we must wait until they get here from New York. I know everybody was anxiously waiting for these certificates to come from New York, and on the morning of April 25th, Wednesday, the same day that Father Kennedy was coming from New York—he is one of the beneficiaries in one of these trust papers for $25,000; he was coming here from New York and we were going down to the Main street station at twelve

something to meet him—that morning sometime after nine o'clock I received a telephone message at my offic telling me to come right up to 4 east Cary, that the certificates had arrived.

"Q. Were you on the 'phone?

"A. Yes.

"Q. Who was at the other end of the 'phone?

"A. I think Father Denis may have called me; I think I talked to both of them on the 'phone.

"Q. They told you they had arrived?

"A. Yes.

"Q. What did you do then?

"A. I immediately went up to 4 east Cary and we were all in the same room—in the back room again."

The forged certificates were copied from the certificate furnished by Watts, and the printing was done "during the week of April 21st."

We do not doubt the admissibility of the testimony for the purpose of showing the probability of the accused's knowledge of the forgery or participation therein, or both. The authorities relied on in the petition are not applicable to the instant case.

[8] The eighth exception was to the exclusion of a letter written by a half-brother of Miss Crump to some person named "Jack," January 14, 1924, eight months after the offense alleged to have been committed by the accused. The connection in which the admissibility of this letter arose can be best gathered from some quotations from the testimony of the witness, who was then under cross-examination by counsel for the accused.

"Q. Not only that, but after your sister was discharged from the asylum, she tried to get another priest into trouble, didn't she?

"A. I don't know anything about that.

"Q. I am going to see if you don't know.   I am sure

you do know.   Don't you know that she took up a priest—tried to get up a correspondence with a Catholic priest at Scranton, Pennsylvania, and began writing him about giving him a golden chalice and giving him vestments and all that sort of thing?   I have got the letters here, and have got your letter.

"A. If you have them, all right.

"Q. Isn't that true?

"A. I don't know if she wrote.   I don't know what was in the letters.

"Q. I will ask you this first, if you didn't write this man—whose name was Jack, wasn't it?

"A. Yes.

"Q. And he is a friend of yours?

"A. Yes.

"Q. This friend she was writing to?

"A. Yes; I helped him out a great deal.

"Q. When you found your sister was writing to him he wrote to you and complained about it, didn't he?

"A. He wrote to me and asked me who this party was and I wrote and told tim.

"Q. Here is the letter.   I will ask you if that isn't the letter?

"A. I wrote and told him she was of unsound mind, to pay no attention to her; that she was of unsound mind.

"Q. What?

"A. I wrote him to absolutely disregard her because she was of unsound mind.

"Q. That is your handwriting.   Read it."

The last question was objected to by the prosecuting attorney and the objection was sustained and the accused excepted.

The letter the accused asked to have read was as follows:

"RICHMOND, VA. 1/14.

"DEAR JACK:

"Delighted to hear from you.   Will say I have not heard from you for a long time, regarding your question; boy that is my half-sister.   She lost her mind sometime ago and has been in the insane sanatorium but is now home for a while.   I am at a loss to know why she wrote you, please ignore any and all letters she writes you.   She has given me no end of trouble. I hope you are doing fine boy.   When you write me write to the office.

"As ever yours,
"BENJ. A. LEIGERS."

It is so plain that the accused could not have been injured by the exclusion of the letter that it is useless to discuss it.

[9] The ninth exception was to the exclusion of any answer by Dr. Moseley to the following question put to him by counsel for the accused: "Were they (visitations of Miss Crump) of such character as to impress Father Denis or Father Callery, or any one else?" The anticipated answer of the witness is not given, and we do not know what it would have been.   He might have answered that he did not know.   The bill of exception, therefore, points out no error committed by the trial court.   *Faris* v. *Dupont De Nemours & Co.,* 123 Va. 88, 92, 96 S. E. 164; *Lynchburg Cotton Mills* v. *Rives,* 112 Va. 137, 142, 70 S. E. 542; *Douglas Land Co.* v. *Thayer,* 107 Va. 292, 58 S. E. 1101.

[10] The tenth exception was to the refusal of the trial judge to permit Dr. Moseley to answer a question. Dr. Moseley was the attending physician of Miss Crump and had testified in chief that he had not called in a consulting physician because Miss Crump did not

wish it, or had forbidden it.    On cross-examination he testified as follows:

"Q. Why did you say none of them would allow you to have any consulting physician at first?

"A. I have just stated to you that the girl refused.

"Q. First you said that none of them would allow you to have any consulting physician. Now you say the girl was responsible. Just explain why you say that.

"A. I don't think it was the wish of Father Denis.

"Q. As a matter of fact, didn't he say it was his wish for you not to have any consulting physician?

"A. I don't think he was consulting his wish at all; I think he was consulting the girl's wish.

"Q. I am asking you to give a direct answer.    Did he or not say he didn't want any consulting physician?

"A. Yes; he said he didn't."

On re-direct examination he testified as follows:

"Q. But that was after Miss Crump had said positively she would not?

"A. Positively refused repeatedly.

"Q. So what he said was carrying out her wishes?

"A. Yes.

"Q. Is that true or not?"

Exception was taken to the refusal to permit an answer to the last question.. In view of the answer to the next preceding question, there could have been but one answer, and that was "yes," to the last question. If there was any error it was harmless.

[11] Exceptions 12 and 15 relate to the production of Miss Crump in court and the remarks of the prosecuting attorney. She had been adjudged insane and sent to the hospital in Staunton, but was at her home in Richmond on parole. During the trial and after it had been shown by the accused that Miss Crump was a very frail, delicate little woman, about five feet, one

inch tall, weighing from seventy to ninety pounds, and about twenty-eight to thirty years of age, and after much testimony had been given as to her influence over the accused, one of the jurors inquired: "In order that the jury might observe this woman, would it be in order to have her here? The object of the question was that we might observe her personality." The court then inquired of counsel on each side: "Do you desire a summons issued for her?" and each responded: "I don't want her." Thereupon the court directed a subpoena to be issued for her with a view of probably putting her on the stand as a "court witness." When Miss Crump appeared in court on a later date, the following proceeding was had:

"The court: There are two questions that arise in this case. In the first place, from the testimony in this case it would be involved in this alleged criminal transaction and she could not be compelled to testify if her testimony would tend to incriminate her; in the second place, there is an allegation of her insanity. I know nothing of that, judicially or otherwise, except what I have heard in the court.

"A juror: It wasn't my intention to have Miss Crump testify, but just to observe her personality.

"Mr. Smith: We offer no objection at all. I don't know how far it is legal.

"Mr. Satterfield: Just neither side examine her; just see how she looks.

"By the court (questioning Miss Crump):

"Q. Miss Crump, have you any lawyer to consult in this matter?

"A. Have I got one to consult?

"Q. Yes.

"A. No, sir.

"Q. You have no lawyer?

"A. No, sir.

"Q. Do you want to testify in this case?

"A. Whatever you want to do.

"Q. What?

"A. Whatever you want to do.

"Q. It is my duty to inform you that you are not compelled to testify in this case if you have the impression that your testimony will in any wise tend to incriminate you. You have a right to refuse if you think your testimony would tend to incriminate you.

"A. I don't think I have done anything that would tend to incriminate me.

"Q. You don't think you have done anything to incriminate you?

"A. No, sir.

"Q. Have you been to Staunton or Williamsburg?

"A. Yes, sir; I was at Staunton; at Dr. DeJarnette's.

"Q. You were at Staunton?

"A. Yes, sir.

"Q. Have you the paper that was given you, whether you were paroled or discharged?

"Mr. Smith: I want to note an exception to all this that is going on.

"The court: Was she paroled or discharged as cured?

"Mrs. Beck: I couldn't tell you. I never read the paper because my sister had charge of it.

"The court: I will not take the responsibility of putting this woman on the stand under the circumstances."

When the court's attention was called to the fact that Miss Crump had not been sworn and that, in answer to a question propounded by the court in the presence of the jury, she had replied: "I don't think I have done anything that would tend to incriminate me;" the court instructed the jury to disregard that answer as testimony.

In the closing argument of the prosecuting attorney he said "that the jury could look at her and see that she could not influence anybody or have any control over them." To this statement by the Commonwealth's attorney the defendant then and there objected, on the ground that the jury could not form any fair impression from seeing her today after all her vicissitudes as to what she looked like or was in April, 1923, and the court declined to require the Commonwealth's attorney to withdraw his argument or modify it, and failed to give any instruction whatever on this point.

It is said in the petition for the writ of error that "unless she was going to be used as a witness she should not have been produced before the jury. They had no right to draw any conclusion from her appearance. It was not an issue in the case. It was not relevant to the issue.

"Her appearance there in July, 1924, may have been and doubtless was entirely different from what it was in the winter and spring of 1923. The circumstances and environment under which she appeared to the jury, excited, frightened and humiliated, as she certainly was, and then known to the jury as a trickster and a fraud were entirely different from those under which she appeared to the accused with a halo of piety, and if you please a nimbus of wealth and charity, a person of high importance attended by her personal attorney, physician and nurse. The contrast was greatly to the prejudice of the accused. It was an unfair contrast as it was also an altogether unusual proceeding in a court room."

It is also assigned as error that the trial court failed to take any action in reference to the statement of the prosecuting attorney.

When Miss Crump appeared in court and the court made the remark about the two questions that arose,

a juror interposed the statement: "It wasn't my intention to have Miss Crump testify, but just to observe her personality," and counsel for the accused said: "We offer no objection at all.  I don't know how far it is legal."  This disposes of the objection to the mere appearance of Miss Crump before the jury.  If no objection was offered then, it is too late to offer any now.

[12] It seems clear that the object of the judge in interrogating Miss Crump was to determine whether or not he would have her put on the stand as a witness. As soon as he ascertained that she was a lunatic on parole, he declined to put her on.  The specific answer to the question objected to was stricken out, and the jury told to disregard it.  There was nothing in this procedure which could have been prejudicial to the accused.

[13] The remarks of the prosecuting attorney were equally harmless.

[14, 15] Exception was taken to instructions 1, 2 and 5, given by the court, and to the refusal of the court to give instructions A and B, tendered by the accused; and the ruling of the trial court thereon is assigned as error.  Instructions 1 and 2 are copied in the margin.[1]

---

[1] "The court instructs the jury that if they believe from the evidence and all the surrounding circumstances, beyond all reasonable doubt, that the accused had the blank certificate of deposit of the First National Bank of New York printed at the Colonial Printing Shop, and that he filled up said blank certificates and signed the names thereto, or was present and aided or assisted any other person in doing so, that he did utter or attempt to utter and employ it as a true and genuine certificate of deposit of the First National Bank of New York, with intent as charged in the indictment, then they should find the accused guilty.

[2] "The court instructs the jury that if they believe from the evidence and all the surrounding circumstances as shown by the evidence, beyond a reasonable doubt, that the accused had knowledge of the printing of the blank certificates of deposits of the First National Bank of New York, although he never actually gave the order personally to the printing company, and that he filled up said certificate, or was present and aided and assisted any other person in so doing, and that he afterwards uttered or attempted to utter and employ it as true and genuine, with intent to defraud as charged in the indictments, they should find the accused guilty.

The chief objection to instructions 1 and 2, in fact the only substantial objection, is that there is no evidence in the record on which to base them.   The close intimacy of the parties and their daily conferences are important matters to be taken into consideration.  The certificates of deposit, were not printed on safety paper, such as is used by banks, but the paper was sleazy, and one of the certificates bore interest at six per cent, a fact so improbable with a New York bank with $250,-000,000 of deposits as to render the paper suspicious. Hotchkiss called the attention of the accused to the unusual condition of the paper.   Litchford also "called his attention to the fact that I was rather unfavorably impressed with its appearance."   P. B. Watts and Donald Register were also very unfavorably impressed with the appearance of the certificates.   In fact, the certificates of deposits which were in evidence before the jury, carried on their faces such evidence of falseness as would impress any one of ordinary intelligence. Add to this the testimony of J. Leicester Watts that the accused asked him to obtain for him a certificate of deposit; that he obtained a typewritten copy and delivered it to the accused in the presence of Miss Crump; that they had "a little talk about it;" that "after this copy was furnished to them we were having a watchful waiting policy until these came;" that he was told by Miss Crump, or the accused, or both of them, "that the certificates would come from New York; that the copy was furnished by Watts on April 21; that the printing was done about this time; that the certificates in controversy were identical with the copy furnished by Watts, and that they were shown to Watts on April 25, by Miss Crump, in the presence of the accused, with the statement that they had been received that morning; that the accused had stated to Watts and also to Dr. Cosby that he knew the money

claimed by Miss Crump was in New York because he had seen it and could swear to it; that all of these things transpired before the accused negotiated the certificate upon which he obtained a loan of $1,000. When these facts, and others appearing in the record, are taken into consideration, they furnished ample support for the instructions complained of. The case could only be proved by circumstantial evidence, but the fact that much of the evidence was circumstantial was no objection to it. *Walker* v. *State*, 127 Ga. 48, 56 S. E. 113, 8 L. R. A. (N. S.) 1175, 119 Am. St. Rep. 314; *State* v. *Henderson*, 29 W. Va. 147, 1 S. E. 225.

[16] It was for the jury to determine whether it was sufficient to satisfy them beyond a reasonable doubt of the guilt of the accused. The accused was amply protected by the instructions of the court on the subject of reasonable doubt. The doctrine of reasonable doubt was ridden to exhaustion.

Instruction 5, given by the trial court, was as follows: "The jury are instructed that if from the evidence they are satisfied beyond all reasonable doubt that the prisoner either actually and personally made the alleged forged instrument, or was actually present, aiding, abetting and assisting some other person to do so, with the felonious intent as charged in the indictment when the alleged forged writing was made, they should find him guilty."

[17] The objection made to the instruction was that it makes it a crime to forge a paper with felonious intent, even though it never gets out of the forger's possession; that there is no evidence to support it, and that it was wrong as an abstract proposition.

We have already seen that there was abundant evidence to support the instruction.

As to the forgery of the certificates: In 2 Bishop's

New Criminal Law, sec. 602, p. 343, it is said: "Forgery, though a substantive crime, partakes, as already observed, of the nature of attempt; therefore, the making alone of the false writing, with the evil intent, is sufficient. No fraud need be actually perpetrated, and there *need be no uttering.*" (Italics supplied.)

In 13 Am. & Eng. Ency. L. (2d ed.), p. 1102, it is said: "The forging of an instrument and the uttering thereof are distinct and separate offenses, and the offense of uttering is not a necessary element of forgery."

In 7 Cyc., p. 1390, it is said: "A person may be convicted of forgery by having possession of a forged instrument with intent to defraud, although never uttered by him." To the same effect see *State* v. *Hathorn,* 166 Mo. 229, 65 S. W. 756; *Perkins* v. *Commonwealth,* 7 Gratt. (48 Va.) 651, 56 Am. Dec. 123.

Instruction 5 is manifestly taken from an instruction given in *Perkins* v. *Commonwealth, supra,* and is nearly a copy of it. In a written opinion refusing a writ of error in the Perkins case, it is said: "The matters of law stated by the court in that instruction are correctly stated." See also instructions approved in *Chahoon's Case,* 20 Gratt. (61 Va.) 733, 744.

[18] The trial court committed no error in giving instruction No. 5.

It is assigned as error that the trial court refused to give instruction "A," which is as follows: "The court instructs the jury that the fact that the defendant stated that he had seen the money in New York raised no presumption that he forged the certificates of deposits, or that he used them, knowing the same to be forged."

The whole subject of presumption, as applied to the facts of the case, was fully covered by other instructions granted by the court, and the instruction is

obnoxious to the further objection that it singled out and called attention to a part only of the evidence and the fact it tended to prove, and omitted all reference to a volume of evidence tending to raise a different presumption. *Norfolk, etc., Co.* v. *Aetna, etc., Co.,* 124 Va. 221, 98 S. E. 43; *Harris* v. *Comonwealth,* 129 Va. 751, 105 S. E. 541.

[19] The refusal of the trial court to grant instruction "B," tendered by the accused, is also assigned as error.

That instruction was as follows: "The court instructs the jury 'that the fact that a forged certificate of deposit was found in the defendant's possession, and that he uttered or used the same, raises no presumption of law in itself that he forged the same.' "

The only argument advanced in support of the instruction is the following quotation from Underhill on Evidence (3d ed.), section 629: "The fact that a forged writing is found in the defendant's possession raises no presumption of law that he forged it or any other writing." Citing *State* v. *Miles,* 22 Idaho 166, 124 P. 786; *Fox* v. *People,* 95 Ill. 71; *Miller* v. *State,* 51 Ind. 405; *Miller* v. *State,* 71 Fla. 338, 71 So. 280.

The cases cited do not support the text quoted. In *Miller* v. *State,* 71 Fla. 338, there was no evidence that the defendant ever had possession of the forged instrument, or that he could write at all. In *Miller* v. *State,* 51 Ind. 405, the distinction is drawn between possession of negotiable paper with forged endorsement in blank and which would pass from hand to hand by mere delivery, and the possession of such paper where the name of the maker was forged. *State* v. *Miles,* 22 Idaho 166, 124 Pac. 786, makes the same distinction, and *Miller* v. *State,* 51 Ind. 405, is relied on as its sole authority.

In *State* v. *Miles*, it is said: "The State has sought to raise a legal presumption that he forged the endorsements by reason of the fact that he cashed the check and admits cashing the check at Hartdegan.

"This presumption is claimed on the theory that one who passes a forged instrument vouches for and certifies to its genuineness. This is undoubtedly true as to the maker of the instrument, but the rule certainly cannot prevail to the extent here claimed with reference to an endorsement. This check was endorsed in blank, and, after a check is once endorsed in blank by the payee, it can lawfully pass from hand to hand without further endorsement. Section 3491, R. C. It would be a dangerous rule of law to announce that anyone who cashes a check on which the name of the payee has been forged is himself presumed to have forged the name of the payee thereon. This is a very different presumption from that of passing an instrument forged in its inception and to which the maker's name has been forged."

In *Fox* v. *People*, 95 Ill. 71, it was held that the mere possession of a forged instrument of itself and unsupported by proof of an intent to defraud, will not warrant a conviction of forgery.

In none of these cases was there an uttering of an instrument in which the name of the maker was forged.

On the other hand there are a number of cases taking a different view from that expressed by Underhill. The possession of the forged instrument is likened to the possession of goods recently stolen.

In *State* v. *Britt*, 14 N. C. 122, it is said: "It is next to impossible that the defendant could get possession of such an instrument as this, purporting to be for his own benefit, without having fabricated or aided in the fabrication of it. If the instrument be a forgery, he

who holds it under such circumstances is taken to be the forger, unless he shows the contrary."

In *State* v. *Peterson*, 129 N. C. 556, 40 S. E. 9, 85 Am. St. Rep. 756, it was held that where one is found in the possession of a forged instrument, endeavoring to obtain money or advances upon it, this raises a presumption that he either forged it or consented to its forgery.

To the same effect see *State* v. *Jestes* (N. C.), 117 S. E. 385, and cases cited.

In *State* v. *Williams*, 152 Mo. 115, 53 S. W. 424, 75 Am. St. Rep. 441, it was held that "one who is recently in possession of and attempts to sell or obtain money on a forged note is presumed to have forged the same, and, unless such possession or forgery is satisfactorily explained, the presumption becomes conclusive." For reason of the rule see *State* v. *Allen*, 116 Mo. 556, 22 S. W. 792.

In *State* v. *Pyscher*, 179 Mo. 140, 77 S. W. 836, it was held that the possession of the forged instrument by the defendant, and the claim of title thereunder, raises a presumption that the defendant was the forger.

In *Hobbs* v. *State*, 75 Ala. 1, it is said: "One found in the possession of a forged instrument of which he purported to be the beneficiary, and applying it to his own use, must, in the absence of explanation, be presumed to have fabricated it, or to have been privy to its fabrication. It is difficult to conceive that he could have the possession unless he had fabricated it, or assented to its fabrication and the presumption grows stronger where he uses or attempts to use it." Other cases are to the same effect.

The trial court committed no error in refusing instruction "B."

[20] The petition for the writ of error concludes

thus: "We had intended to discuss the question as to whether there was sufficient evidence to support the verdict, but this petition is already too long, and without in any way waiving the importance and merit of this question, we are forced to forego presentation of this point."

This, of course, is not an assignment of error, and cannot be treated as such, but we have been compelled to examine the whole record in order to pass upon questions properly raised, and hence are able to say that even if this matter had been properly assigned we could have afforded no relief. At the first trial of this case there was a "hung jury," at the second, the verdict and judgment now under review were rendered, and whatever may be our views upon the weight of the evidence, we are unable to say that the verdict is either without evidence to support it, or that it is plainly contrary to the evidence.

Upon the whole case we are of opinion to affirm the judgment of the trial court.

*Affirmed.*